**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 21-cr-378-TJK-5** |
| | : | |
| **v.** | : | **18 U.S.C. § 231(a)(3)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| **NATHANIEL A. TUCK,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>STATEMENT OF OFFENSE</u>**

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Nathaniel A. Tuck, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

***The Attack at the U.S. Capitol on January 6, 2021***

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752, due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives

and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. This joint session of Congress was an official proceeding as that term is used in Title 18, United States Code, Section 1512. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 p.m., the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.     At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7.     Shortly thereafter, at approximately 2:20 p.m., members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

8.     The attack at the U.S. Capitol adversely affected the United States Secret Service, which was protecting Vice President Michael Pence.  It also affected commerce within the District of Columbia. For example, it affected the sales of Safeway grocery stores within the District of Columbia, whose products also travel in interstate commerce before being sold in the District. D.C. Mayor Muriel Bowser imposed a 6 p.m. curfew on January 6 in response to the riot, and Safeway stores in the District of

Columbia closed at 4 p.m. (instead of 11 p.m.) as a result, resulting in lost sales.

9.      The attack at the U.S. Capitol was a "civil disorder" as defined in 18 U.S.C. § 232(1).

### *Nathaniel Tuck and the Proud Boys*

10.      Nathaniel Tuck ("Defendant") is a 32-year-old resident of Florida. As of January 6, 2021, Defendant was a member of the "Space Coast" chapter of the Proud Boys organization, which was based in central Florida.

11.      The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

12.      Through at least January 6, 2021, Enrique Tarrio was the national chairman of the Proud Boys organization. Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location.

### *Defendant's Plans to Travel to Washington, D.C. on January 6*

13.      Defendant traveled to Washington, D.C. with other members of the Space Coast chapter on December 11, 2020, for an election-related event. Prior to that event, on November 21, 2020, Defendant told other members of the chapter in a group chat on Telegram: "So my wife just found out that I bought my flight and hotel to DC. She's not speaking to me lol."  He added, "I'm sure Martha Washington was always mad at George."

14.     During the rally on December 12, 2020, several Proud Boys were involved in an altercation in which Proud Boys members were injured, including a knife wound suffered by Proud Boys member, Jeremy Bertino.

15.     Also while in Washington, D.C. on December 12, 2020, a group of Proud Boys that included Enrique Tarrio participated in the theft and destruction of a banner that read, "#BLACKLIVESMATTER," which banner was property of Asbury United Methodist Church in Washington, D.C.

16.     After the event on December 12, 2020, Defendant celebrated the Proud Boys' involvement in altercations on the streets of Washington, D.C. For example, on December 12, 2020, Defendant sent text messages to family members in which he stated, "I knocked out like 4 Antifa today. Omg"; "huge mayhem brawl and then me and 4 others walked around caught their stragglers in alleyways. We busted their faces. They were screaming and crying"; "I cold clocked a black guy right in the face. He didn't even see it coming." On December 14, 2020, Defendant sent his mother an image from the rally via text message and stated, "Our ancestors fought, died, and spilled blood to create our nations and to protect our nations. I will not be robbed of that honor."

17.     Defendant also made statements to family members expressing his animus toward law enforcement. On December 14, 2020, Defendant sent text messages to his father, Kevin Tuck, about messages Kevin Tuck had sent in a Proud Boys group chat on Telegram. Defendant told his father, "You're not going to convince anyone to support the police. It doesn't matter if the cops like us, they'll still arrest us. They'll still be the arm of the leftist government if they're told to." When Kevin Tuck responded, "Agreed but we can't make them our enemy," Defendant stated, "They will be one day."

18.     The Tucks also discussed the planned January 6, 2021 congressional certification of the Electoral College votes from the 2020 presidential election. On December 15, 2020, Kevin Tuck sent a text message stating "This just in: From Trump's Lawyer," and included a lengthy message about the details of the certification process, including in part:

> On January 6th, […] Vice President Mike Pence will have all the authority as president of the Senate for that day and will accept or reject motions to decide the next steps by the assembly.
>
> Remember... Mike Pence is in full authority that day as written in the Constitution. The ballots will be certified today but that means nothing...
>
> […]
>
> The House and Senate will divide for two hours (at least) to debate, then vote. The vote will be per Senator with the Vice President being the deciding vote if needed in the Senate, while the vote in the House will be only be ONE vote per delegation, per state, not per House member!!! The Republicans have 30 delegation votes compared to the Democrats 20 delegation votes.
>
> If this scenario runs true, President Trump gets re-elected.

Defendant responded, "I hope that's true dad." Through these and other communications, Defendant knew that Vice President Pence would be at the Capitol for the certification of the Electoral College vote on January 6.

19.     On December 16, 2020, Kevin Tuck told Defendant that "War is here" and "We need to talk about a few things." Kevin Tuck listed actions to be undertaken, including procuring "Some short wave or Long wave radio that every chapter needs to have" to communicate in case of phone or internet outages; "gathering intelligence on where these people that are causing these problems live. So we can take them out. RWDS"[1]; and procuring "More food" and "More Ammo."

20.     On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, which date coincided with Congress's

---

[1] "RWDS" is an acronym used by some groups standing for "Right Wing Death Squad."

Certification of the Electoral College vote. That same day, Kevin Tuck and Defendant discussed traveling between January 5 and January 7, 2021, to attend "another million mega march in Washington D.C."

21.     Tarrio and a handful of other members of the Proud Boys created a new chapter for the Proud Boys that would consist of members from across the country. The new chapter was referred to as the Ministry of Self Defense or MOSD ("MOSD"). Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members."

22.     On December 27, 2020, Defendant was invited to join the MOSD by Joe Biggs, another member of the Proud Boys leadership.

23.     In messages exchanged among members of the MOSD on Telegram, in which Defendant used Telegram Account ID# 821561329 with the screen names "Wannabe PB" and "Кров і ґрунт ⚡⚡", members discussed the potential for violence at the Capitol on January 6.

24.     On January 3, 2021, the following exchange took place in the "Ministry of Self-Defense – MAIN":

Gabriel PB:     1776 flag flying over the White House last night.

The Vidivic:     ?

John Rackham:   Gonna be war soon ……

Gabriel PB:     Yes Sir time to stack those bodies in from of Capitol Hill

[…]

E-Geezy
[Edward George, Jr]:



[…]

BrotherHunter
Jack Phillips:   Also this 🎵.  So are the normies and "other" attendees going to push thru police lines and storm the capitol buildings?  A few million vs A few hundred coptifa should be enough.  I saw a few normie groups rush through police lines on the 12th.

Deplorable51:   cue the music…….."let the bodies hit the floor let the bodies hit the floor 🎵"

25.     Later on January 3, 2021, a different MOSD member posted a video message in which he remarked that the people effecting the stolen election had been "caught" and that by persisting, they were "gonna make the whole country stand up and fuckin' do bad things to bad people."

26.     On January 4, 2021, members of the MOSD exchanged additional messages that discussed attacking the Capitol on January 6, 2021. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, one of the leaders of the MOSD wrote, "They would do nothing because they can do nothing."

27.     Enrique Tarrio was arrested upon his arrival in Washington, D.C. on January 4, 2021. Tarrio was charged with the destruction of the BLM banner on December 12, 2020, and the possession of two high-capacity magazines that were found in his possession during his arrest. Tarrio was released from jail on January 5, 2021. As part of the conditions of his release, Tarrio

was ordered to stay away from Washington, D.C., which meant that Tarrio would not be present in Washington, D.C. on January 6, 2021.

28.     On January 5, 2021, Defendant was also added to a private message group on Telegram for Proud Boys who had traveled to Washington, D.C. The Telegram group was called "Boots on Ground."

29.     Messages were subsequently posted on Telegram that advised Proud Boys in Washington, D.C. to meet at the Washington Monument at 10 a.m. on January 6. Participants in the MOSD Telegram group were told that "[Ethan Nordean] is in charge, cops are the primary threat, don't get caught by them or BLM, don't get drunk until off the street." Members were told not to wear Proud Boys colors and instead to "[c]ome out [] as patriot!" The same instruction was issued in the Boots on Ground chat.

### *Defendant's Participation in the January 6, 2021 Capitol Riot*

30.     Defendant and his father, Kevin Tuck, traveled from central Florida to Washington, D.C. together with Proud Boys Arthur Jackman and Joe Biggs. The group stayed in a rental unit together on the evening of January 5, 2021.

31.     On the morning of January 6, 2021, the Tucks traveled to the National Mall with Jackman and Biggs and met a group of approximately one hundred Proud Boys members near the Washington Monument shortly after 10 a.m.  As instructed, Defendant did not wear any Proud Boys colors. Defendant wore a black beanie hat, black jacket with black gloves, khaki pants, and dark grey boots.  At times he also wore a black gaiter pulled over the bottom of his face.

32.     Shortly after 10 a.m., Proud Boys Ethan Nordean and Joseph Biggs marched the group away from the rally that was taking place near the Washington Monument. Nordean announced to the group that they were going to march to the Capitol.

33.     As the group marched toward the Capitol, Nordean and Biggs addressed the men, including Defendant, through a megaphone—telling them that in their view the police and government had failed them. As the group walked past the west side of the Capitol at approximately 11:20 a.m.—more than an hour prior to the initial breach—Nordean announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means."

34.     A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., Biggs gave the group of officers the middle finger, and the men marching with Biggs taunted them, yelling "treason," and warning the officers, "don't make us go against you."

35.     The marching group, including Defendant, continued to the east side of the Capitol. Defendant and Jackman briefly separated from the group while they were on the east side of the Capitol.

36.     Shortly before noon, Nordean and Biggs led the marching group back to the west side of the Capitol to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW, arriving at approximately 12:10 p.m. There the group stopped and waited for approximately thirty minutes. The Tucks and Jackman rejoined the group near the food trucks. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them back towards the Capitol.



37.     Nordean led the marching group to an area known as the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol, which was approximately 100 feet away, was guarded by a handful of Capitol Police officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

38.     Upon arriving at the Peace Circle, Biggs led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!"

39.     At 12:53 p.m., approximately one minute after Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade. The crowd quickly overwhelmed the line of officers at the barricades. The crowd trampled the barricades and advanced toward the Capitol building. Defendant walked onto Capitol grounds as part of the advancing crowd. Defendant understood that he was not permitted to be on Capitol grounds.

40.     At approximately 12:56 p.m., Defendant advanced into the West Plaza with K. Tuck and Jackman. By approximately 1:00 p.m., the group made their way to the front of the crowd and stood opposite a line of officers in riot gear.



41.     Defendant remained on the West Plaza for approximately 45 minutes. From his position in the crowd, Defendant saw rioters assault law enforcement using chemical spray and hand-to-hand violence.

42.     At approximately 1:45 p.m., a group of Proud Boys were assembled near the base of a set of concrete stairs on the West Plaza. The stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. A small group of outnumbered officers guarded the entrance to the stairs. One of the Proud Boys who had marched with the Tucks and the other Proud Boys to the Capitol initiated a push by shoving two officers and pushing them up the stairs. Almost instantaneously thereafter, the crowd overwhelmed the officers and pushed up the scaffolding.

43.     Shortly thereafter, the Tucks reunited with Nordean, Biggs, and Jackman on the lawn just north of the concrete stairs and scaffolding. From that position, they watched as the

crowd eventually overwhelmed the line of officers and surged through the scaffolding and up the concrete stairs toward the Capitol building.

44.     Upon seeing the crowd advance toward the building, Rae and Biggs rushed back to the concrete stairs in an attempt to advance to the Capitol. The Tucks remained on the lawn with Jackman.

45.     The Tucks and Jackman began to move to the east side of the building by walking on the lawn around the north side of the Capitol building. The Tucks and Jackman reunited with Proud Boy Edward George, Jr. on the north lawn.



46.     The group continued toward the east side of the Capitol where they encountered a line of officers who were attempting to stop the crowd from advancing to the building. At approximately 2:16 p.m., the group, including Defendant, breached the line of officers, and Defendant advanced toward the Capitol building with Kevin Tuck, Jackman, and George.

47.     At approximately 2:18 p.m., the group approached the Senate Carriage Door on the north side of the Capitol. United States Capitol Police officers gave verbal commands and attempted to physically deter the crowd from entering the building. Defendant was near the front of the crowd and understood that officers were attempting to stop the crowd from entering the

building. Defendant pushed his way through the crowd and multiple United States Capitol Police officers to enter the building. George attempted to enter behind Defendant but was denied entry by the police.



48.     On his way into the building, Defendant pushed past multiple police officers who were defending the door and made physical contact with at least one of them.



49.     Shortly after Defendant was able to force his way into the Capitol Building, a uniformed United States Capitol Police officer attempted to stop and remove him from the building. Defendant pushed the officer's arm away with an open hand and broke free of the officer's grip.

50.     A few moments later, the same officer reengaged with Defendant and grabbed him. Defendant defied the officer's attempt to get Defendant to leave the Capitol building. Defendant engaged in a discussion with the officer, then pulled away and used his elbow to push away the officer's hand. Defendant walked away from the officer and the direction to which the officer was attempting to direct him.



51.     Defendant continued deeper into the Capitol Building. By approximately 2:38 p.m.,

Defendant was inside the Rotunda of the Capitol, where he remained initially until approximately

2:40 p.m.



52.     At approximately 2:44 pm, Defendant was at the front of a group of rioters who had been stopped from proceeding further near the Old Supreme Court Chamber by a group of officers from the Metropolitan Police Department. The group taunted officers with chants of "our house" and "USA." Defendant said "haven't gotten mine [stimulus check] either.  you're getting paid right?  I didn't get my stimulus check.  They're all out of shape, guys.  Come on." When another rioter referred to the officers as "just following orders. Like the Germans," Defendant said, "they're not Nazis, they're communists." Ultimately, the group, including Defendant, had to be physically removed from the area by the police.



53.     At approximately 2:57 p.m., Defendant reunited with Paul Rae and Ethan Nordean in the Rotunda.



54.     Defendant exited the building with Nordean and Rae at approximately 3:12 p.m. through the Rotunda Door. By that time, Defendant had been inside of the Capitol Building without lawful authority for approximately fifty-four minutes.

55.     After exiting the building, Defendant reunited with other Proud Boys on the lawn of the Capitol. Defendant posed for a celebratory photograph on Capitol grounds with Biggs, Nordean, Jackman, Kevin Tuck, and George. In the photograph, below, Rae can be seen holding an American flag that George and Jackman had stolen from a corridor near the Senate Gallery.



56.     On January 6, 2021, in a text message conversation with family members, K. Tuck stated, "We stormed the capital." Defendant added, "Fought the police."

57.     After the attack on the Capitol on January 6, 2021, the FBI began investigating and arresting participants in the Capitol riot, including Proud Boys. On January 20, 2021, Joe Biggs was arrested. Defendant and his father discussed Biggs's arrest in text messages. Kevin Tuck stated, "I hope he doesn't tell them about me." Defendant stated, "The article says the fbi says

'Biggs was seen entering with several other Proud boys who were in disguise' . . . You had a mask the whole time. You're fine. Only way is if Biggs' identifies you but he is not a snitch."

58.     On March 19, 2021, while discussing the criminal charges that had been filed against Biggs and others, Defendant and Kevin Tuck again discussed the investigations by text message. Defendant expressed he thought FBI was "overcharging" Proud Boys. Kevin Tuck stated, "We may lose this battle but we will win the war. We will be able to sue after." Defendant responded, in part, "Politics won't save us. Violence is the only way we will win."

### *Elements of the Offenses*

59.     The parties agree that Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3), requires the following elements:

    a.  First, the defendant knowingly committed an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

    b.  Second, at the time of the defendant's act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

    c.  Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.

60.     The parties agree that Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1), requires the following elements:

    d.  First, the defendant entered or remained in a restricted building or grounds without lawful authority to do so.

    e.  Second, the defendant did so knowingly.

### *Defendant's Acknowledgements*

61.     The defendant knowingly and voluntarily admits to all the elements as set forth above.

62.     Specifically, the defendant admits that he knowingly committed an act with the intended purpose of obstructing, impeding, and interfering with one or more law enforcement officers through his course of conduct on January 6, 2021, including by pushing and making physical contact with officers while forcing his way into the building through the Senate Carriage Door at approximately 2:18 p.m. The defendant further admits that, at the time of his act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder. The defendant further admits that the civil disorder obstructed, delayed, and adversely affected commerce or the movement of any article or commodity in commerce, and the conduct or performance of any federally protected function.

63.     Additionally, the defendant admits that he entered and remained in the restricted building and grounds of the United States Capitol without lawful authority to do so, and that he did so knowingly.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     /s/ *Jason McCullough*
JASON B.A. MCCULLOUGH
DC Bar No. 998006; NY Bar No. 4544953
ALEXIS J. LOEB
CA Bar No. 269895
MONIKA (ISIA) JASIEWICZ
DC Bar No. 1024941
Assistant United States Attorneys

601 D Street NW
Washington, DC 20530
(202) 252-7233
jason.mccullough2@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Nathaniel Tuck, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 7/26/24

Nathaniel Tuck
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

7/26/24

Date:

William Shipley
Attorney for Defendant