UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Case No. 21-cr-00378-TJK |
| ) | |
| **NATHANIEL TUCK,** ) | |
| ) | |
| Defendant ) | |

**DEFENDANT NATHANIEL TUCK'S SENTENCING STATEMENT**

William L. Shipley, Jr., Esq.
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*

I. <u>Introduction</u>

Comes now Defendant Nathaniel Tuck by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on January 8, 2025.

Mr. Tuck appears for sentencing before this Court having pled guilty to Counts Two and Seven of the Indictment, charging him with violations of, 18 U.S.C. Sec. 231(a)(3) Civil Disorder and 18 U.S.C. Sec. 1752(a)(2) Disorderly and Disruptive Conduct in a Restricted Building or Grounds.

As to the violation of 18 U.S.C. Sec. 231(a)(3), Mr. Tuck faces a statutory maximum penalty of up to 5-year imprisonment and a fine up to $250,000.

As to the violation of 18 U.S.C. Sec. 1752(a)(2), Mr. Tuck faces a statutory maximum penalty of up to 12 months imprisonment and a fine up to $100,000.

The Probation Officer has recommended a sentence of 10 months followed by three years of Supervised Release.

II. <u>Sentencing Guidelines Calculation</u>

Pursuant to the written plea agreement in this case, the parties have an agreed-upon Guideline calculation that applies to Mr. Tuck.

The Guideline Calculation set forth in the Presentence Report follows the agreed-upon terms of the plea agreement, and sets forth the calculation as follows:

<u>Count Two: 18 U.S.C. Section 231(a)(1)</u>

**Base Offense Level:** 10

|  |  |
|---|---|
| Specific Offense Characteristics: | +3 |
| Victim Related Adjustment: | 0 |
| Adjustment for Role in the Offense: | 0 |
| Adjustment for Obstruction of Justice: | 0 |

**Adjusted Offense Level (Subtotal):** 13

Chapter Four Adjustment: 0

Acceptance of Responsibility: -2

**Total Offense Level:** 11

Count Seven:  18 U.S.C. Section 1752(a)(2)

**Base Offense Level:** 4
    Specific Offense Characteristics: +2
    Victim Related Adjustment: 0
    Adjustment for Role in the Offense: 0
    Adjustment for Obstruction of Justice: 0

**Adjusted Offense Level (Subtotal):** 6

**Total Offense Level:** 6

Grouping of counts adds an additional +1 adjustment and the Final Offense Level is 12.

Based on an offense level of 12, and a criminal history score of 0, the Recommended Guideline Range is 10-16 months.

The Plea Agreement provides that Mr. Tuck might also be entitled to a further -2 reduction as a "Zero Point Offender" under U.S.S.G. Sec. 4C1.1, as he has no criminal history points and the offense of conviction is not a crime of violence.  As set forth in more detail below, Mr. Tuck does qualified under Section 4C1.  With that additional reduction, Mr. Tuck's Total Offense Level is 10.

Based on the Total Offense Level of 10, and a Criminal History Category of I, the recommended Guideline Range is 6-12 months – in Zone B of the Sentencing Table.

III.   <u>The Offense Conduct</u>.

The parties entered into an agreed upon "Statement of Offense" as part of the plea agreement. The Probation Officer has accurately set forth the relevant facts in the Presentence Report.

IV.   <u>Sentencing Factors Under Sec. 3553(a)</u>

Pursuant to 18 U.S.C. § 3553(a), several factors are to be considered by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to the Defendant's background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

1.   Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.

   a.   <u>The Nature and Circumstances of the Offense</u>.

For the most part, the events of the day on January 6 are not in dispute and need not be recounted here. As Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1) A relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence with the goal of disrupting the Congress's certification of the 2020 Electoral Vote.

2) A larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election -- but with no predetermined intention of engaging in violence – some of whom were drawn into committing acts of violence once on the Capitol grounds and confronted by the police presence; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups. Some members of this third group entered the Capitol building, walked around, and then exited without incident. Mr. Tuck's conduct on January 6 straddled the line between the second and third groups.

Defendant Tuck traveled to Washington, D.C., with his father, Kevin Tuck, and other co-defendants, including Arthur Jackman and Joe Biggs, staying in a rental unit the night before January 6, 2021. The following morning, the group went to the National Mall, where they joined other members of the Proud Boys near the Washington Monument and the group marched toward the Capitol, during which some members expressed their grievances about government and police actions. While Mr. Tuck was present during these events, there is no evidence indicating he personally incited or participated in inflammatory chants or gestures. He primarily remained a singular member of a much larger group of individuals, and mostly observed the conduct of others.

At approximately 12:53 p.m., individuals at the front of a large crowd of protesters pushed through and past barriers erected across a public walkway

to the Capitol, pushing past a small number of U.S. Capitol Police Officers at that location, one of whom suffered significant injuries as a result. Mr. Tuck was not near the front of this group, did not participate in pushing through the barriers and past the officers, and only proceeded onto Capitol grounds as part of the much larger crowed that followed after the path was clear. While he was aware of restrictions in place, there is no indication that Mr. Tuck was directly involved in the initial breach or in any planning of the events.

There is very little Mr. Tuck or the undersigned counsel can tell this Court about the sequence of events beginning at approximately 12:50 just past the Peace Fountain. This sequence of events has been the subject of multiple trials before this court over the past two-plus years. The Court has seen all the video and is well familiar with many other individuals involved at the very front of the crowd that pushed through the barriers and caused the injury to the Officer. Mr. Nathan Tuck was not among that group. The fact that he had been with some individuals who were among that group through the course of the morning is not a basis to hold Mr. Tuck accountable for what happened due to the conduct of others over whom he had no control.

Once on Capitol grounds and at the Lower West Plaza area, Mr. Tuck remained with the group, observing the events around him. He was positioned close enough to the "front" that he could see the line of police officers keeping the crowd back from the building. He witnessed physical confrontations and engagements between law enforcement and protesters, including acts of violence by each directed at the others. But Mr. Tuck did not engage in any such acts.

There is no dispute that another member of the Proud Boys from Florida, Daniel "Milkshake" Scott, was the first to charge into two U.S. Capitol Police Officers at the bottom of the stairs near the northwest corner of the lower plaza, and created the opportunity for the large crowd at the base of the stairs to use them in order to reach the Upper Terrance level. But Mr. Tuck played no role in the actions of Mr. Scott who acted on his own.

Mr. Tuck and his father did not follow the crowd up the northwest stairs. Instead they walked around the north side of the building to reach the east side where they found a line of U.S. Capitol Police keeping the crowd back from the building. At that location Mr. Tuck did disregard the instructions of officers and moved past them to reach the Senate Carriage doors. In doing so he did make incidental physical contact with the officer(s) as a result of there being too many individuals in too small a confined space all at the same time. In these moments Mr. Tuck did again refuse to follow in the order(s) of one or more law enforcement officers that he turn around and leave the building.

Inside the Capitol, Mr. Tuck moved through various areas, including the Rotunda, where he engaged in verbal exchanges with officers and others present. His comments reflected frustration but did not constitute direct threats or incitement. He exited the Capitol after approximately 54 minutes and later joined others on the Capitol lawn for a photograph.

While Defendant Tuck's actions on January 6, 2021, included unauthorized entry onto Capitol grounds and refusing to follow the lawful commands of various law enforcement officers while there, there is no evidence to suggest that by his actions he participated in or orchestrated acts of violence

directed at law enforcement officers. In addition to there being no acts of violence, there is no substantive and significant evidence that Mr. Tuck threatened the use of violence towards any law enforcement officer on January 6.

### b. History and Personal Characteristics.

Mr. Tuck was born on January 30, 1992, in Chicago, Illinois, and is the son of Kevin Adrian Tuck and Maria Tuck. His father, aged 55, is employed as a roofing manager, and his mother, also aged 55, is a stay-at-home grandmother. He resides next door to his parents in Apopka, Florida. Mr. Tuck was raised in a stable and supportive environment, first in Chicago, Illinois, and later in Orlando, Florida, where the family relocated when he was ten years old.

Mr. Tuck grew up with two younger sisters: Zenaida (age 29) and Marisa (age 28). Mr. Tuck described his upbringing as positive, with his parents providing a stable and abuse-free household. His father worked diligently to support the family, while his mother maintained a nurturing home. The family practiced Christianity and attended a non-denominational church, fostering a safe and values-oriented environment. Mr. Tuck enjoyed a well-rounded childhood, including participation in sports such as baseball, football, and paintball, and he also cared for several family pets during his youth.

In 2016, Mr. Tuck married his wife Gabriela, and they have one child together, age 3. They have resided in the their own home in Apopka, Florida for six years.

Mr. Tuck has lived in several locations throughout his life, including Atlanta, Georgia, and various counties in Florida, but has been rooted in his current residence for several years.

When he was young, Mr. Tuck was homeschooled by his mother, Maria Tuck, in a supportive and focused learning environment. He successfully earned his high school diploma in 2010 and continued his education at Seminole State College of Florida in Orlando. Demonstrating his dedication to public service, Mr. Tuck completed the Florida Law Enforcement Academy in 2011, where he earned a career certificate.

Mr. Tuck has more than seven years of experience in specialized police skills, highlighting his commitment to law enforcement and public safety. Additionally, he holds a professional license for health insurance sales in Florida and is a licensed insurance agent in Mississippi and Ohio. He has previously been licensed in Florida, Louisiana, Nevada, and Texas, reflecting his dedication and professional qualifications in the field.

2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

This Court, as a matter of justice and equity, should treat Mr. Tuck no different than other largely non-violent offenders convicted for their involvement in the events at the Capitol on January 6 – regardless of his

membership in the Proud Boys. Based on the nature of the offense conduct and the crimes to which Mr. Tuck has pled guilty, the pre-January 6 rhetoric reflected in various communications cited in the PSR – particularly communications by and between others that Mr. Tuck on received incidentally – are of minimal or no relevance for purposes of sentencing. This Court, more than any other in this District, has seen thousands of communications between members of various Proud Boy factions and the "national" leadership. While the PSR is filled with examples of the kinds of messages the Court is all-too-familiar with, only a sparse few of these communications reflect any involvement or participation by Mr. Tuck.

Mr. Tuck engaged in no acts of violence. He did not engage in any physical confrontations – acts of violence -- with law enforcement officers beyond the incidental episode at the Senate Carriage door, and he did not engage in any destruction of property.

In *United States v. Borgerding*, 21-cr-000631-TJK, this Court sentenced the Defendant to 50 days of incarceration. Unlike Mr. Tuck, *Borgerding*, exercised his rights and proceeded to trial on the violation of 18 U.S.C. Sec. 231(a)(3) and was found guilty by a jury. However, like Mr. Tuck, *Borgerding* caused no damage to the Capitol and engaged in no physical violence.

In *United States v. Ackerman*, 24-cr-00060-TJK, the Defendant was also charged with a violation of 18 U.S.C. 231(a)(3), like Mr. Tuck accepted a plea and this Court sentenced *Ackerman* to time-served. Based on a review of the docket, *Ackerman* was detained upon arrest on June 20, 2023, and released from custody on release conditions on July 6, 2023. Therefore serving a

sentence of sixteen days.  Like Mr. Tuck, *Ackerman* caused no damage to the Capitol and engaged in no physical violence.

DEFENDANT'S SENTENCING RECOMMENDATION

Based on specific offense conduct here, the fact that the recommended Guideline Range of 6-12 months is in Zone B of the Sentencing Table – authorizing a sentence of probation in this case pursuant to Sec. 5B1.1(a)(2) -- and taking into consideration all the factors set forth by Congress in Section 3553(a), a sentence of 36 months probation with a condition that 6 months of that probation be served on home detention, accomplishes the purposes of Section 3553(a), is a sentence that adequately addresses the seriousness of the offense involved, and promotes future respect for and adherence to the law not only by Mr. Tuck but by the public at large.

Dated: January 2, 2025   Respectfully submitted,

/s/ William L. Shipley
William L. Shipley, Jr., Esq.
PO BOX 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com