**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-378-TJK-5** |
| **NATHANIEL A. TUCK,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nathaniel A. Tuck to 24 months' imprisonment, 36 months' supervised release, restitution in the amount of $2000, and the mandatory assessment of $125. The government recommends an eight-month upward variance because Nathaniel Tuck, himself a former police officer, planned and coordinated with others for weeks in advance to disrupt the Electoral College certification taking place on January 6, 2021, including through violence and deliberate defiance of the police—and then acted in accordance with those plans, breaching the Capitol together with his compatriots, opposing police efforts to quell the unrest, and purposefully interrupting the peaceful transfer of presidential power for the first time in American history.

## I.    INTRODUCTION

As set forth in the Statement of Offense (ECF No. 211), former police officer Nathaniel Tuck, along with his father Kevin Tuck, prepared for and then engaged in persistent efforts to interfere with police at the Capitol and disrupt the Electoral College certification on January 6. Nathaniel Tuck prepared for and took these actions as part of a hand-selected group of Proud Boys

1

members[1] that openly discussed its plans for violence at the Capitol and intention to confront police who might try to stand in their way. Nathaniel and Kevin Tuck also discussed the Electoral College certification on family text messages, and Nathaniel Tuck spoke openly of his animus toward police and willingness to engage in violence.

On January 6, the Tucks and their associates followed through on their plans and the Tucks were at the forefront of the breach of the Capitol building during several critical moments. They were among the first wave of rioters who entered Capitol grounds after the breach of Capitol grounds at 12:53 p.m. They watched rioters assaulting police officers on the West Plaza for approximately 45 minutes, and they took action when the crowd eventually overwhelmed officers to push up the scaffolding and to the Upper West Terrace. Specifically, the Tucks and their co-defendant Arthur Jackman made their way to the east side of the building. While en route, they encountered co-defendant Edward George, Jr., and the group continued toward the east side of the Capitol. At approximately 2:16 p.m., the group made a collective push to breach a police line attempting to stop the crowd from advancing to the building. They ultimately succeeded. They then approached the Senate Carriage Door at approximately 2:18 p.m., where the group attempted to enter through a door where police officers were attempting to remove rioters from inside the building.

Nathaniel Tuck was the sole member of the group who successfully pushed his way past a line of multiple Capitol Police officers, making physical contact with at least one officer as he did

---

[1] As discussed herein and set forth fully in the Statement of Offense (ECF No. 211), the Ministry of Self Defense ("MOSD" was a hand-selected group of "rally boys" who vowed to follow the commands of leadership.

so. Nathaniel Tuck was one of the few rioters who successfully entered the building through the Senate Carriage Door when police were attempting to eject rioters out of the building through that door.

Nathaniel Tuck spent most of the next hour inside the Capitol building, where he berated officers, shouting at them and calling them "communists." After leaving the building at approximately 3:12 p.m., Tuck posed for a celebratory photograph on Capitol grounds with his co-defendants and other Proud Boys, then bragged in a text message conversation with family members that he had "[f]ought the police." In March 2021, in text messages with his father about FBI investigations into other Proud Boys, Nathaniel Tuck stated, "Politics won't save us. Violence is the only way we will win."

Nathaniel Tuck's rampage on January 6 had a purpose: he breached the Capitol grounds and building, pushing past police officers by force, and interfered with officers' attempts to stop the crowd's advance because he intended to obstruct the Electoral College certification and police's efforts to defend the building. And Tuck took these actions in concert with others who shared in his criminal purpose, including his father and remaining three co-defendants in this case. Together, they carried out and celebrated these actions as part of a larger group of Proud Boys who espoused the same objectives. *See United States v. Ethan Nordean, et al.*, No. 21-cr-175 (TJK) at ECF No. 855-2 (Gov't Sentencing Memorandum for Ethan Nordean) and ECF No. 855-3 (Gov't Sentencing Memorandum for Joseph Biggs); *United States v. Fonticoba*, No. 21-cr-638 (TJK) at ECF No. 57 (Gov't Sentencing Memorandum for Gilbert Fonticoba).

For the reasons outlined herein, Nathaniel Tuck's calculated and coordinated conduct on January 6 warrants the imposition of a meaningful upward variance from the applicable Guidelines

range. Accordingly, the government recommends that the Court sentence Nathaniel Tuck to 24 months of incarceration for his convictions of violating 18 U.S.C. §§ 231(a)(3) and 1752(a)(1).

## I.    FACTUAL BACKGROUND

The government refers the court to the Statement of Offense filed in this case, ECF No. 211, for a short summary on the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Nathaniel Tuck's Conduct on January 6, 2021*

Nathaniel Tuck is a 32-year-old resident of Florida and a former police officer. As of January 6, 2021, Tuck was a member of the "Space Coast" chapter of the Proud Boys organization, which was based in Central Florida. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

Through at least January 6, 2021, Enrique Tarrio was the national chairman of the Proud Boys organization. Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy insofar as the president of a local chapter governs that chapter in its geographic location.

### *Tuck's Plans to Travel to Washington, D.C. on January 6*

Nathaniel Tuck traveled to Washington, D.C. with other members of the Space Coast

chapter on December 11, 2020, for an election-related event. Prior to that event, on November 21, 2020, Tuck told other members of the chapter in a group chat on Telegram: "So my wife just found out that I bought my flight and hotel to DC. She's not speaking to me lol." He added, "I'm sure Martha Washington was always mad at George."

During the rally on December 12, 2020, several Proud Boys were involved in an altercation in which Proud Boys members were injured, including a knife wound suffered by Proud Boys member, Jeremy Bertino. Also while in Washington, D.C. on December 12, 2020, a group of Proud Boys that included Enrique Tarrio participated in the theft and destruction of a banner that read, "#BLACKLIVESMATTER," which banner was property of Asbury United Methodist Church in Washington, D.C.

After the event on December 12, 2020, Tuck celebrated the Proud Boys' involvement in altercations on the streets of Washington, D.C. For example, on December 12, 2020, Tuck sent text messages to family members in which he stated, "I knocked out like 4 Antifa today. Omg"; "huge mayhem brawl and then me and 4 others walked around caught their stragglers in alleyways. We busted their faces. They were screaming and crying"; "I cold clocked a black guy right in the face. He didn't even see it coming." On December 14, 2020, Nathaniel Tuck sent his mother an image from the rally via text message and stated, "Our ancestors fought, died, and spilled blood to create our nations and to protect our nations. I will not be robbed of that honor."

Nathaniel Tuck also made statements to family members expressing his animus toward police. On December 14, 2020, he sent text messages to his father, Kevin Tuck, about messages Kevin Tuck had sent in a Proud Boys group chat on Telegram. Nathaniel Tuck told his father, "You're not going to convince anyone to support the police. It doesn't matter if the cops like us,

they'll still arrest us. They'll still be the arm of the leftist government if they're told to." When Kevin Tuck responded, "Agreed but we can't make them our enemy," Nathaniel Tuck stated, "They will be one day."

The Tucks also discussed the planned January 6, 2021 congressional certification of the Electoral College votes from the 2020 presidential election. On December 15, 2020, Kevin Tuck sent a text message stating, "This just in: From Trump's Lawyer," and included a lengthy message about the details of the certification process, including in part:

> On January 6th, […] Vice President Mike Pence will have all the authority as president of the Senate for that day and will accept or reject motions to decide the next steps by the assembly.
>
> Remember... Mike Pence is in full authority that day as written in the Constitution. The ballots will be certified today but that means nothing...
>
> […]
>
> The House and Senate will divide for two hours (at least) to debate, then vote. The vote will be per Senator with the Vice President being the deciding vote if needed in the Senate, while the vote in the House will be only be ONE vote per delegation, per state, not per House member!!! The Republicans have 30 delegation votes compared to the Democrats 20 delegation votes.
>
> If this scenario runs true, President Trump gets re-elected.

Nathaniel Tuck responded, "I hope that's true dad." Through these and other communications, Nathaniel Tuck knew that Vice President Pence would be at the Capitol for the certification of the Electoral College vote on January 6.

On December 16, 2020, Kevin Tuck told Nathaniel Tuck that "War is here" and "We need to talk about a few things." Kevin Tuck listed actions to be undertaken, including procuring "Some short wave or Long wave radio that every chapter needs to have" to communicate in case of phone or internet outages; "gathering intelligence on where these people that are causing these problems

live. So we can take them out. RWDS"[2]; and procuring "More food" and "More Ammo."

On December 19, 2020, former President Trump announced plans for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, which date coincided with Congress's Certification of the Electoral College vote. That same day, Nathaniel Tuck and his father discussed traveling between January 5 and January 7, 2021, to attend "another million mega march in Washington D.C."

Shortly thereafter, Tarrio and a handful of other members of the Proud Boys created a new chapter for the Proud Boys that would consist of members from across the country. The new chapter was referred to as the Ministry of Self Defense or MOSD ("MOSD"). Tarrio described the MOSD as a "national rally planning" chapter that would include only "hand selected members." On December 27, 2020, Nathaniel Tuck was invited to join the MOSD by Joe Biggs, another member of the Proud Boys leadership.

In messages exchanged among members of the MOSD on Telegram, in which Nathaniel Tuck used Telegram Account ID# 821561329 with the screen names "Wannabe PB" and "Кровь i грунт ⚡⚡" (translation: blood and soil ⚡⚡), members discussed the potential for violence at the Capitol on January 6.

On January 3, 2021, the following exchange took place in the "Ministry of Self-Defense – MAIN":

Gabriel PB:    1776 flag flying over the White House last night.

The Vidivic:   ?

John Rackham:Gonna be war soon ……

---

[2] "RWDS" is an acronym that stands for "Right Wing Death Squad."

Gabriel PB:    Yes Sir time to stack those bodies in front of Capitol Hill

[…]

E-Geezy
[Edward George, Jr]:



[…]

BrotherHunter
Jake Phillips:    Also this 🖕.  So are the normies and "other" attendees going to push thru police lines and storm the capitol buildings?  A few million vs A few hundred coptifa should be enough.   I saw a few normie groups rush through police lines on the 12th.

Deplorable51: cue the music…….."let the bodies hit the floor let the bodies hit the floor 🎵"

Later on January 3, 2021, a different MOSD member posted a video message in which he remarked that the people effecting the stolen election had been "caught" and that by persisting, they were "gonna make the whole country stand up and fuckin' do bad things to bad people."

On January 4, 2021, members of the MOSD exchanged additional messages that discussed attacking the Capitol on January 6, 2021. One MOSD member posted, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, one of the leaders of the MOSD wrote, "They would do nothing because they can do nothing."

On January 5, 2021, Nathaniel Tuck was also added to a private message group on Telegram for Proud Boys who had traveled to Washington, D.C. The Telegram group was called "Boots on Ground." Messages were subsequently posted on Telegram that advised Proud Boys in Washington, D.C. to meet at the Washington Monument at 10 a.m. on January 6. Participants in the MOSD Telegram group were told that "[Ethan Nordean] is in charge, cops are the primary threat, don't get caught by them or BLM, don't get drunk until off the street." Members were told not to wear Proud Boys colors and instead to "[c]ome out [] as patriot!" The same instruction was issued in the Boots on Ground chat.

### *Nathaniel Tuck's Participation in the January 6, 2021 Capitol Riot*

Nathaniel Tuck and his father, Kevin Tuck, traveled from central Florida to Washington, D.C. together with Proud Boys Arthur Jackman and Joe Biggs. The group stayed in a rental unit together on the evening of January 5, 2021.

On the morning of January 6, 2021, the Tucks traveled to the National Mall with Jackman and Biggs and met a group of approximately one hundred Proud Boys members near the Washington Monument shortly after 10 a.m. As instructed, Nathaniel Tuck did not wear any Proud Boys colors. Instead, he wore a black beanie hat, black jacket with black gloves, khaki pants, and dark grey boots. At times he also wore a black gaiter pulled over the bottom of his face.

Shortly after 10 a.m., Proud Boys Ethan Nordean and Joseph Biggs marched the group away from the rally that was taking place near the Washington Monument. Nordean announced to the group that they were going to march to the Capitol. As the group marched toward the Capitol, Nordean and Biggs addressed the men, including Tuck, through a megaphone—telling them that in their view the police and government had failed them. As the group walked past the west side

of the Capitol at approximately 11:20 a.m.—more than an hour before the initial breach—Nordean announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means."

A few minutes later, as the group marched past U.S. Capitol Police officers at approximately 11:28 a.m., Biggs gave the group of officers the middle finger, and the men marching with Biggs taunted them, yelling "treason," and warning the officers, "don't make us go against you."   The marching group, including the Tucks, continued to the east side of the Capitol. Nathaniel Tuck and Jackman briefly separated from the group while they were on the east side of the Capitol.

Shortly before noon, Nordean and Biggs led the marching group back to the west side of the Capitol to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW, arriving at approximately 12:10 p.m. There the group stopped and waited for approximately thirty minutes. The Tucks and Jackman rejoined the group near the food trucks. At approximately 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them back towards the Capitol.



*Figure 1: The Tucks gather at the food trucks at 2nd Street and Constitution Avenue NW before proceeding onto Capitol Grounds.*

10

Nordean led the marching group to an area known as the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Before their arrival, the Peace Circle was uncrowded and relatively peaceful. The First Street pedestrian entrance to the Capitol grounds, which was approximately 100 feet away, was guarded by a handful of Capitol Police officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."   Upon arriving at the Peace Circle, Biggs led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!"

At 12:53 p.m., approximately one minute after Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade and quickly overwhelmed the line of officers. The crowd trampled the barricades and advanced toward the Capitol building. Nathaniel Tuck walked onto Capitol grounds as part of the advancing crowd. He understood that he was not permitted to be on Capitol grounds.

At approximately 12:56 p.m., Nathaniel Tuck advanced into the West Plaza with his father and Jackman. By approximately 1:00 p.m., the group made their way to the front of the crowd and stood opposite a line of officers in riot gear.



*Figure 2: The Tucks and Jackman opposite police on the West Plaza.*

11

Nathaniel Tuck remained on the West Plaza for approximately 45 minutes. From his position in the crowd, Tuck saw rioters assault police using chemical spray and hand-to-hand violence.

At approximately 1:45 p.m., a group of Proud Boys assembled near the base of a set of concrete stairs on the West Plaza. The stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. A small group of outnumbered officers guarded the entrance to the stairs. One of the Proud Boys who had marched with the Tucks and the other Proud Boys to the Capitol shoved two officers, driving them up the stairs. Almost instantaneously thereafter, the crowd overwhelmed the officers and moved up the scaffolding. Shortly thereafter, the Tucks reunited with Nordean, Biggs, and Jackman on the lawn just north of the concrete stairs and scaffolding. From that position, they watched as the crowd eventually overwhelmed the line of officers and surged through the scaffolding and up the concrete stairs toward the Capitol building. Seeing the crowd advance toward the building, Paul Rae and Biggs rushed back to the concrete stairs in an attempt to advance to the Capitol. The Tucks remained on the lawn with Jackman.

The Tucks and Jackman began to move to the east side of the building by walking on the lawn around the north side of the Capitol building. The Tucks and Jackman reunited with Proud Boy Edward George, Jr. on the north lawn.

12



*Figure 3: The Tucks and Jackman advancing up the north lawn of the Capitol.*

The group continued toward the east side of the Capitol where they encountered a line of officers attempting to stop the crowd from advancing to the building. At approximately 2:16 p.m., the group, including Nathaniel Tuck, breached the line of officers, and Nathaniel Tuck advanced toward the Capitol building with Kevin Tuck, Jackman, and George. Ex. A (Jackman, George, and Kevin Tuck can be seen at left in the first frame of the video; Nathaniel Tuck is visible in the same area as the crowd parts).



*Figure 4: Jackman, George, Kevin Tuck, and Nathaniel Tuck (left to right) breaching the police line; Screenshot of Ex. A at 0:00.*

At approximately 2:18 p.m., the group approached the Senate Carriage Door on the north side of the Capitol. United States Capitol Police (USCP) officers gave verbal commands and attempted to physically deter the crowd from entering the building. Nathaniel Tuck was near the front of the crowd and understood that officers were attempting to stop the crowd from entering the building. Nathaniel Tuck pushed his way through the crowd and multiple USCP officers to enter the building. George attempted to enter behind Tuck but was denied entry by the police.



*Figure 5: Nathaniel Tuck pushing his way in the Senate Carriage Door past several police officers; screenshot of Ex. B at 19:18:13 p.m.*

On his way into the building, Nathaniel Tuck pushed past multiple police officers who were defending the door and made physical contact with at least one of them.



*Figure 6: Tuck pushing past multiple police officers at the Senate Carriage Door; still shot of Ex. C at 19:18:16 p.m.*

Shortly after Nathaniel Tuck was able to force his way into the Capitol Building, a uniformed USCP officer attempted to stop and remove him from the building. Nathaniel Tuck pushed the officer's arm away with an open hand and broke free of the officer's grip. A few moments later, the same officer reengaged with Nathaniel Tuck and grabbed him. Nathaniel Tuck defied the officer's attempt to get him to leave the Capitol building. Nathaniel Tuck engaged in a discussion with the officer, then pulled away and used his elbow to push away the officer's hand. He then walked away from the officer and continued to advance into the Capitol building.

15



*Figure 7: Nathaniel Tuck breaking free of an officer's grasp at the Senate Carriage Door; screenshot of Ex. B.*

Nathaniel Tuck continued deeper into the Capitol Building. By approximately 2:38 p.m., Nathaniel Tuck was inside the Rotunda of the Capitol, where he remained until approximately 2:40 p.m.

At approximately 2:44 pm, Nathaniel Tuck was at the front of a group of rioters who had been stopped from proceeding further near the Old Supreme Court Chamber by a group of officers from the Metropolitan Police Department. The group taunted officers with chants of "our house" and "USA." Nathaniel Tuck said, "haven't gotten mine [stimulus check] either.   you're getting paid right?   I didn't get my stimulus check.   They're all out of shape, guys.   Come on." Ex. D at 0:47 – 1:02. When another rioter referred to the officers as "just following orders. Like the

Germans," Nathaniel Tuck, said, "they're not Nazis, they're communists." *Id.* at 1:10 – 1:20.

Ultimately, police had to physically remove the group, including Nathaniel Tuck, from the area.



*Figure 8: Body-worn camera footage of Nathaniel Tuck berating officers; still shot of Ex. D.*

At approximately 2:57 p.m., Nathaniel Tuck reunited with Paul Rae and Ethan Nordean in

the Rotunda.



*Figure 9: Tuck and co-defendant Paul Rae in the Rotunda.*

Nathaniel Tuck remained inside the Capitol Building without lawful authority for approximately fifty-four minutes. He exited the building with Nordean and Rae at approximately 3:12 p.m. through the Rotunda Door.

After exiting the building, Nathaniel Tuck reunited with other Proud Boys on the lawn of the Capitol. He posed for a celebratory photograph on Capitol grounds with Biggs, Nordean, Jackman, Kevin Tuck, and George. In the photograph, below, Rae can be seen holding an American flag that George and Jackman had stolen from a corridor near the Senate Gallery.



*Figure 10: Nathaniel Tuck circled in yellow.*

On January 6, 2021, in a text message conversation with family members, Nathaniel Tuck's father, Kevin Tuck, stated, "We stormed the capital." Nathaniel Tuck added, "Fought the police."

***Nathaniel Tuck's Conduct After January 6, 2021***

After the attack on the Capitol on January 6, 2021, the FBI began investigating and arresting participants in the Capitol riot, including Proud Boys. On January 20, 2021, Joe Biggs was arrested. Nathaniel Tuck and his father discussed Biggs's arrest in text messages. Kevin Tuck stated, "I hope he doesn't tell them about me." Nathaniel Tuck responded, "The article says the fbi says 'Biggs was seen entering with several other Proud boys who were in disguise' . . . You had a mask the whole time. You're fine. Only way is if Biggs' identifies you but he is not a snitch."

On March 19, 2021, while discussing the criminal charges that had been filed against Biggs and others, Nathaniel Tuck and his father again discussed the investigations by text message. Nathaniel Tuck stated that he thought FBI was "overcharging" Proud Boys. Kevin Tuck stated, "We may lose this battle but we will win the war. We will be able to sue after." Nathaniel Tuck responded, in part, "Politics won't save us. Violence is the only way we will win."

## II.    THE CHARGES AND PLEA AGREEMENT

On May 29, 2024, a federal grand jury returned a Third Superseding Indictment charging Nathaniel Tuck with six counts: violations of 18 U.S.C. §§ 1512(c)(2) and 2; 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(G); and 18 U.S.C. § 231(a)(3). ECF No. 181. On September 6, 2024, Nathaniel Tuck was convicted of Counts Two and Seven, charging violations of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 231(a)(3), respectively, based on a guilty plea entered pursuant to a plea agreement. *See* ECF Nos. 210-211.

## III.   STATUTORY PENALTIES

Nathaniel Tuck now faces sentencing on those two counts. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 5 years of

imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory $100 special assessment on Count Seven. He faces up to one year of imprisonment, a fine of $100,000, a term of supervised release of not more than one year, restitution, and a mandatory $25 special assessment on Count Two.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Presentence Report correctly sets forth the Guidelines calculations, PSR ¶¶ 120-144:

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3 | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass at Restricted Building | +2 |
| | | 6 |

Count Seven: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2B2.4(b)(1)(A) | Physical Contact | +3 |

**Total**                                                                                **13**

**Multiple Count Adjustment**                                                        **+1**
Counts Two and Seven do not group, which results in an increase of 1 level from the highest offense level (Count Seven), under U.S.S.G. § 3D1.4. This results in an Offense Level of 14.

| | |
|---|---|
| **Combined Offense Level** | **14** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | -2 |
| **Total Adjusted Offense Level:** | **12** |

*See* Plea Agreement at ¶ 4(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline,

U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The parties agreed, and the PSR correctly noted, that Nathaniel Tuck is not eligible for an adjustment because he used violence in connection with the offense. *See* U.S.S.G. § 4C1.1(a)(3); PSR ¶ 143; Plea Agreement ¶ 4(C).

The U.S. Probation Office calculated Nathaniel Tuck's criminal history as category I, which is not disputed. PSR ¶ 147. Accordingly, the Guidelines imprisonment range is 10 to 16 months' imprisonment. Nathaniel Tuck's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

**<u>Upward Variance</u>**

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Nathaniel Tuck's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court vary upwards from the top of the Guidelines range.

Nathaniel Tuck was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and resulted in more than $2.9 million in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Nathaniel Tuck "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59

(D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in Nathaniel Tuck's Guidelines calculation reflects these facts. Nathaniel Tuck would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[3] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. So a sentence within Nathaniel Tuck's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children

---

[3] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 603 U.S. 480 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See id.* at 506 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67.

But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. As this Court recently put it, "[W]hat a dangerous precedent the attack on January 6 set. What a Pandora's Box it opened. We still don't [know] how corrosive it will prove to be to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power." *United States v. Sparks*, 21-CR-87-TJK, Sent. Tr. at 94.

Indeed, even before the Supreme Court's decision in *Fischer,* judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. Most recently, this Court varied upwards in the case of Tuck's co-defendant Paul Rae, stating at sentencing that his Guidelines range of 6-12 months did not account for Rae's planning and preparation with a large group, including for violence, or

his intent to obstruct the Electoral College certification. *See United States v. Rae*, 21-cr-378-TJK-2 (sentencing Rae to 14 months' incarceration).

Likewise, in *United States v. Sparks*, 21-cr-87-TJK, this Court sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21 and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just police officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And "not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-4-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up).    Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence

that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

Because the seriousness and full context of Nathaniel Tuck's crime is not adequately captured by the applicable Guideline, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* prompted the government to dismiss the charge under 18 U.S.C. § 1512(c)(2) in this case, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up).   Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting

guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this Court has made clear its view that January 6 was "corrosive … to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power." *Sparks* Sent. Tr. at 94. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law.

In this case, the government submits that an upward variance of 8 months is warranted to reach an appropriate sentence. As discussed below, this Court has sentenced similarly situated defendants who acted with corrupt intent to influence an official proceeding to custodial terms of between 48 and 57 months. While Nathaniel Tuck was not convicted of obstructing the certification, the relevant conduct set forth above and in the Statement of Offense demonstrate that Tuck carried out his criminal actions with the intent to stop Congress from certifying the Presidential Election—a necessary step in the peaceful transfer of power. And Nathaniel Tuck

came to D.C. prepared to take action through means of force and violence. This was not a righteous act of petitioning government for redress of grievances—it was a deliberate act intended to persuade government officials through the use of violence and intimidation, e.g., "Violence is the only way we will win."

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As described detail in Section II of this memorandum, the nature and circumstances of Nathaniel Tuck's crimes threatened to create a constitutional crisis, were rife with violence and credible threats of violence, and militate strongly in favor of a substantial sentence of incarceration. Nathaniel Tuck's actions were concerted and purposeful, aimed at halting the certification. Nathaniel Tuck understood that Congress was meeting at the Capitol on January 6 to certify the electoral vote, and he knew that Vice President Pence would be at the Capitol on January 6. Nevertheless, in the lead-up to January 6, Nathaniel Tuck joined a group of men who were undertaking extensive efforts to amass and direct force and violence against the Capitol. On January 6, he personally joined in bringing those plans to fruition, working in concert with other Proud Boys throughout the day to achieve his objective. And Nathaniel Tuck contributed to the violence of the riot through coordinated efforts to breach police lines and joining others in their intimidation of the outnumbered officers.

Throughout his time at the Capitol, Nathaniel Tuck demonstrated through his actions that his violent rhetoric before and after January 6 constituted no empty threat. He pushed past multiple

27

police officers to enter the building at the Senate Carriage Door, openly defying one officer's attempt to stop him by wresting free of the officer's grasp. Inside the building, he joined other rioters in taunting the outnumbered police officers who were trying to keep the crowd from penetrating further into the building. He spent nearly an hour inside the halls of Congress while lawmakers, who were at that time supposed to be certifying the results of the 2020 presidential election, remained in hiding. Afterward, he bragged to family members—including his police officer father—that he (a former police officer) had "[f]ought the police," and commented to his father upon the arrests of fellow Proud Boys that "[p]olitics won't save us. Violence is the only way we will win."

The sentence imposed by this Court must reflect the seriousness of Tuck's crimes.

### B.  Nathaniel Tuck's History and Characteristics

Nathaniel Tuck is 32 years old and lives in Apopka, Florida with his wife and son, on the same street as his father and co-defendant, Kevin Tuck. Nathaniel Tuck is currently employed part-time with a power washing company and was until September 2024 working as an independent insurance agent in the health field. From 2012 to 2020, Nathaniel Tuck was a police officer, first with the Longwood Police Department in Longwood, Florida, then the Apopka Police Department in Apopka, Florida. He told the U.S. Probation Office that he quit his police job in October 2020 "because of the whole George Floyd thing." PSR ¶ 174. Tuck does not have any criminal history.

Nathaniel Tuck joined the Proud Boys organization in 2018, and as of January 6, 2021, was a member of the "Space Coast" chapter of the group in central Florida. Communications among the group routinely celebrated the use of violence to obtain an objective. And the group's

discussions preparing for January 6 reflected the same rhetoric. When the time came, Nathaniel Tuck contributed to the violence at the Capitol both individually and by working in concert with his compatriots. In the aftermath of the day's events, he continued to celebrate the violence that occurred, posing for photographs with fellow Proud Boys proudly displaying a stolen American flag.

Nathaniel Tuck's history and characteristics weigh in favor of a lengthy term of incarceration.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Nathaniel Tuck's conduct on January 6 was the epitome of disrespect for the law. Despite having served as a police officer himself, Nathaniel Tuck not only defied the police on January 6, but he celebrated that defiance, bragging to family—including his police officer father, Kevin Tuck—that he had "[f]ought the police." Nathaniel Tuck also referred to police as the "enemy," showing the utmost disrespect for officers who had taken an oath to protect and serve— the same oath that Nathaniel Tuck had taken as a police officer for several years before 2020.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Nathaniel Tuck also weighs

29

heavily in favor of a lengthy term of incarceration.

First, although Nathaniel Tuck has entered a guilty plea, he has not expressed genuine remorse regarding his conduct on January 6. To the contrary, his statements in the aftermath of the riot demonstrate pride in his criminal conduct, and create a risk that Nathaniel Tuck will engage in political violence again in the future. After telling his father in March 2021 that he thought the FBI was "overcharging" Proud Boys involved in the January 6 riot, he opined: "Politics won't save us. Violence is the only way we will win." Tuck's statement is particularly chilling given that it came after criminal charges had been filed against Joe Biggs, with whom Nathaniel Tuck posed for a celebratory photograph on January 6 as part of a group. Even knowing that his compatriots were facing criminal charges and knowing that he and others he had joined had "fought" the outnumbered officers at the Capitol, Nathaniel Tuck was continuing to advocate for violence—not peaceful protest. Nathaniel Tuck's continued embrace of force and violence as a means of obtaining a political objective demonstrates the need for specific deterrence in his case.

Finally, the need for both general and specific deterrence is also especially strong because of Tuck's choice of target (the Constitutionally-mandated certification of a democratic election) and Tuck's participation in a criminal collective. *See Callanan v. United States*, 364 U.S. 587, 593 (1961) (noting that a "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality").

All of these favors weigh heavily in favor of a lengthy term of incarceration.

E.        **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court has sentenced other Proud Boys who were with Nathaniel Tuck during the events of January 6, and their sentences are instructive in this case.

Most recently, this Court varied upwards to sentence Nathaniel Tuck's co-defendant Paul Rae to 14 months' incarceration, from an advisory Guidelines range of 6-12 months. *United States v. Rae*, 21-cr-378-TJK-2. Like Nathaniel Tuck, Rae was convicted on one misdemeanor count (18 U.S.C. § 1752(a)(1)) and one felony count of civil disorder in violation of 18 U.S.C. § 231. But Rae's interference with police, which entailed tearing down an in-ground metal fence behind which police had formed a line, did not involve physical contact with an officer, unlike in Nathaniel Tuck's case.

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

The Court noted at sentencing that Rae's "planning and coordination" with a large group in advance of and during January 6 set him apart from other rioters who showed up solely with the intent to protest and ended up getting "caught in the moment." The Court also pointed to a comment Rae had made on January 6—"All I want to do is be violent and have Trump as my president"—as linking his violent conduct with the Electoral College proceeding occurring inside the Capitol that day. Like Rae, Nathaniel Tuck planned for and coordinated with other Proud Boys, including his father, in advance of January 6 and throughout the day. Like Rae, Nathaniel Tuck also advocated for violence and linked that violence with his political views, telling his mother on December 14, "Our ancestors fought, died, and spilled blood to create our nations and to protect our nations. I will not be robbed of that honor." Unlike Rae, however, Nathaniel Tuck physically engaged with officers, pushing past them at the Senate Carriage Door, and verbally taunted officers during his time in the building. Nathaniel Tuck's active interference with police during the time he knew the Electoral College certification was occurring is particularly troubling given Nathaniel Tuck's own years of experience as a police officer and his implicit awareness that the certification would need to be halted and could not resume while rioters remained on restricted grounds. Put simply, Nathaniel Tuck understood the oath that the officers were carrying out, and he understood the danger that the officers were in. He defied their commands and used physical force against them. These factors counsel in favor of the government's recommended term of incarceration—24 months—in Tuck's case.

This case warrants a significantly higher sentence than the one this Court imposed in *United States v. Healion*, No. 23-cr-230 (TJK): 100 days' incarceration. Most significantly, unlike Healion, Nathaniel Tuck explicitly called for political violence tied to the Electoral College

certification and police's efforts to defend it. He did that both before January 6, when he characterized police as the "enemy," and after January 6, when he stated that "[p]olitics won't save us. Violence is the only way we will win."

Like Nathaniel Tuck, Healion was a member of the MOSD group chats who interfered with police on January 6 by pulling a bike rack away from police officers. His own messages before January 6, however, did not reflect the level of planning as in Nathaniel Tuck's case. Nathaniel Tuck messaged with his father in December 2020 about the need for Proud Boys chapters to procure radio communications equipment and supplies, the day after his father sent a message describing the certification procedure to be followed on January 6. Unlike Nathaniel Tuck, Healion also did not make physical contact with officers, and also unlike Nathaniel Tuck, who was among the first wave of rioters into the building approximately 5 minutes after the initial breach, Healion entered the building at 2:53 p.m., after hundreds of rioters had stormed the building and Congress had been forced to stop its work.

A more apt comparator is Gilbert Fonticoba, whom this Court sentenced to 48 months of incarceration. *United States v. Fonticoba*, No. 21-cr-638 (TJK). Like Nathaniel Tuck, Fonticoba was part of the group of Proud Boys who breached the Capitol grounds early in the riot. Together with Rae, Fonticoba helped destroy the black metal fence, then entered the building through the Senate Wing Door right after the initial breach—just minutes before Nathaniel Tuck made it into the building through the Senate Carriage Door. Like Nathaniel Tuck, Fonticoba acted in concert with other Proud Boys who shared in his criminal purpose, including members of the MOSD group chat who discussed preparations for violence on January 6. Fonticoba was convicted after a stipulated bench trial of obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2)

34

and civil disorder in violation of 18 U.S.C. § 231(a)(3). At the time of sentencing, 48 months represented a small downward departure from the Guidelines calculation, which was driven by the § 1512(c)(2) charge. But crucially, this Court explicitly stated that it would give the same sentence even if the § 231 charge—which had the same Guidelines range as the § 231 charge in this case, *see id.*, ECF No. 57 (Sentencing Memorandum) at 7—"was the only count of conviction," citing Fonticoba's admitted "intent to obstruct the proceeding and the nature of the proceeding itself." *Id.*, Sent. Tr. at 66.

The government recognizes that unlike Fonticoba, Nathaniel Tuck has not explicitly admitted to intending to obstruct the Electoral College certification. Accordingly it has proposed a significantly lower sentence here. But the need to avoid "unwarranted" disparities between Fonticoba and Nathaniel Tuck—who shared a motivation to stop the certification, and whose conduct on January 6 was similar—counsels in favor of an upward variance here.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Nathaniel Tuck must pay $2,000 in restitution, which reflects in part the role Nathaniel Tuck played in the riot on January 6.[7] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Nathaniel Tuck's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 216.

## VII.    FINE

Nathaniel Tuck's convictions for violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Nathaniel Tuck to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Nathaniel Tuck has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $5,500 to $55,000. U.S.S.G. § 5E1.2(c)(3).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months' imprisonment, 36 months' supervised release, $2000 in restitution, and the $125 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     /s/ Jason McCullough
JASON B.A. MCCULLOUGH
DC Bar No. 998006; NY Bar No. 4544953
MONIKA (ISIA) JASIEWICZ
D.C. Bar No. 1024941
        Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
(202) 858-7233
isia.jasiewicz@usdoj.gov